**KENTX, INC., Plaintiff**

v.

**MODULAR SYSTEMS, INC., MSI BUILDING SUPPLIES, INC., and THOMAS B. BRUNT, III, Defendants**

## Civil No. 77-241

## District Court of the Virgin Islands

Div. of St. Thomas and St. John

## June 27, 1979

JOHN E. STOUT, ESQ. (GRUNERT, STOUT, HYMES, MAYER & SMOCK), St. Thomas, V.I., *for plaintiff*

ROGER L. CAMPBELL, ESQ., St. Thomas, V.I., *for defendants*

CHRISTIAN, *Chief Judge*

## MEMORANDUM

At the completion of the taking of evidence in this cause, and after hearing the oral summations of counsel, the Court dictated its Findings of Fact and Conclusions of Law from the bench. Among other things, the Court concluded that no valid and binding contract existed with respect to the work that was to be performed by defendant, Modular Systems, Inc., for plaintiff, Kentx, Inc. The work having beeen executed, however, the Court further concluded that any adjustment that had to be made in resolution of the conflicting claims of the parties would have to be accomplished on the basis of quantum meruit. The Court's opinion was that only in this manner could a reasonable determination be made as to which of the parties was indebted to the other.

Because the evidence that had been so far adduced did not fully lend itself to a quantum meruit determination, a further hearing was scheduled at which time, by direction of the Court, three experts in the building and construction trade would be called to testify. The three experts in question were the persons who had sought, at the request of the parties, to arbitrate the issues prior to trial in the hope that a trial might be avoided. It is obvious that the attempt at arbitration failed. The three arbitrators were Richard Weber, selected by plaintiff Kentx, Peter Reed, chosen by defendant Modular Systems, Inc., and Fred Gjessing, chosen by the two arbitrators just mentioned.

Not surprisingly, the testimony of Weber and Reed at the hearing showed marked bias in favor of the party by whom they had been respectively appointed. Their evident partisanship led to considerable differences in the range of their estimates. Each of the experts had, in detail, examined the work done by defendant and the subcontractors in the renovation of the L'Escargot Restaurant. Besides this, they had thoroughly examined the billing documents

from defendants to plaintiff. They were then asked in their testimony to estimate what, in their opinion, was the reasonable value, labor and materials of the total work done as evidenced by the finished product.

■ Before discussing the estimate of each expert, certain things taken into account by the Court must be mentioned. Firstly, figures have been rounded off to the nearest dollar; secondly, the amount which the Court found had been paid directly to subcontractors by Kentx was deducted; and finally, an adjustment was made to each estimate to take into consideration the fact that this renovation and refurbishing was done as a "rush job". Were we to rely upon Brunt's actual billing figures alone, no consideration would have to be given defendant for this item because his billings would reflect the additional hands he had to hire to do the work on time and would also reflect the time-and-a-half charged for overtime. Because the Court does not believe that the "crash" nature of the job could be taken into account in the estimate of the experts, the Court deems it only fair to defendants that this allowance be made. Admittedly, there might have been other ways in which like consideration could have been given to defendants. Furthermore, the formula adopted by the Court may not be without shortcomings. In all the circumstances, however, the Court considers its action in this regard just and reasonable.

For the rush nature of the job the Court added 3.75% to each estimate. The Court arrived at this figure as follows: the testimony on the whole fairly shows that 50% (0.50) of the job was for labor and that some 15% (0.15) of that labor represented overtime.[1] Multiplying these two figures, the Court arrived at a figure of .075. This was then

---

[1] The 15% figure is extrapolated from testimony that the laborers usually worked ten (10) -hour days. The extra two (2) hours per day represent 20% of the labor time. The 20% was then reduced to 15% since the testimony was that the laborers usually worked overtime, but not always.

multiplied by 0.50 to reflect the fact that overtime work requires an extra 50% compensation (time-and-half), thus giving the Court the 3.75% "rush job" factor.

The testimony of expert witness Weber with the above calculations applied offered the conclusion that the reasonable value of the work done by defendant was approximately $140,390.[2] The Court views this figure as unreasonably low. Expert witness Peter Reed offered three alternate methods. Under the first, he arrived at a reasonable value of $237,669.[3] Reed arrived at this figure by comparing the work in the instant case with a remodelling job he had done in Christiansted which he felt was comparable. This estimate was based on $42.50 per square foot for the first floor, $25.50 per square foot for the second floor, and $6.00 per square foot for work done in the alleyways. In his second approach to the problem, Reed simply considered the billings from Modular Systems to Kentx, concluded that they were accurate and reasonable, and settled for the sum of those billings, $229,000. As a third method, Reed undertook to place a value on the lease improvement attributable to the new construction and renovation and calculated an estimate of $318,376. He used, by way of comparison, the renovation work done on the shops in the nearby Royal Dane Mall, a comparison the Court finds to be inappropriate.

The witness Gjessing reached his estimate on the basis of $29.00 per square foot for the first floor and second, as well. To this he added a flat $10,000 for the work done in the alleyways. He admitted that he had not taken into account the cost of demolition of the previously existing structure, a figure the Court already found to be $13,455,

[2] Weber's estimate was $174,171. After subtracting the $38,855 paid directly to the subcontractors and adding 3.75% for the rush job ($5,074), the final figure is $140,390.

[3] Reed's estimate was $267,934. After subtracting the $38,855 paid directly to the subcontractors and adding 3.75% for the rush job ($8,590), the final figure is $237,669.

nor had he given credit to defendants for the design fee, $3,000. When these things were totalled, Gjessing's estimate came to $216,455. It is this expert's opinion that the Court will accept. This the Court was moved to do upon its consideration of Gjessing's overall experience, his familiarity with like work throughout the Virgin Islands, his having actually accomplished similar projects, and his seemingly total disinterest as far as the parties are concerned. Subtracting from Gjessing's total, as arrived at by the Court, the amount of $38,855, the sum actually paid to subcontractors by Kentx, and adding the percentage for "rush job", I arrive at a total estimate for Gjessing of $184,260.

The parties are in agreement that Kentx paid defendants $212,706. Subtracting from this the fair value of the work as determined by the Court, $184,260, we arrive at an overpayment of plaintiff of $28,444. To this must be added two additional elements of damage found by the Court in favor of plaintiff and against defendant, namely $3,997, an amount owed to Kentx for food consumed at the restaurants by defendant Brunt, and $5,400, an amount due Kentx for loss of rental from the display case which was tardily installed, and for which defendants have been held liable. This loss of advertising rental is allowed at the rate of $600 per month for nine months, rather than the 15 months claimed by plaintiff. The total sum due plaintiff, therefore, is $37,843.

Defendant Modular Systems made additional claims against plaintiff totalling $33,959 for work done by Modular above and beyond the actual construction and for bills paid for by Modular on behalf of plaintiff.[4] Of this amount

---

[4] Kristine Brunt, evidently the bookkeeper and office manager of Modular Systems, testified regarding amounts due them, plus bills from suppliers and artisans which defendants had paid on plaintiff's behalf, and at its instance and request, in order to maintain their good credit standing when plaintiff refused to pay. The breakdown was, Mechanical Supply $3,792.23;

claimed, the $15,667 for materials allegedly supplied by MSI, a supply corporation owned by Tom Brunt, will not be allowed. The Court reasons that the great bulk of this claim is already encompassed by the quantum meruit valuation of the work. It is fair to say that some of the MSI claim represents materials supplied by defendant in doing day to day repairs and maintenance or in the category designated interior design, rather than in the actual construction. However, there is no basis upon which the Court can reasonably allocate such an amount from the total claim. This imprecision will be counterbalanced, however, by the amounts the Court will credit defendants. Firstly, the full amount claimed in the categories of interior design and overhead will be allowed despite the fact that, according to the analysis of all three experts when they sat as arbitrators, the claims for these categories should be reduced by an amount representing overhead and profit.[5] Moreover, defendants will be credited for the full amount they claim for the entrance display although that figure exceeds the amount actually charged by Borg's Millwork for fabricating and, I suppose, installing the display case by some $1,376. Finally, defendants will receive the full amount claimed for supplies furnished to a firm called "Bob's Welding" in connection with the installation of an elevator and for the remaining claim for Mechanical Supply. Accordingly, a credit of $18,292 will be allowed defendants. Setting this off against the total amount I have

---

MSI $15,667.06; Bob's Welding $1,761.50; entrance display (by Borg Millwork) $7,451.05; interior design $4,542.43; and general maintenance $779.03.

[5] Examination of the exhibits which are made up of the bills included under the separately designated categories of "interior design" and "general maintenance" suggests to the Court that the two might be considered as one. It appears from those exhibits that Brunt and his corporation served plaintiff as a sort of maintenance and handy man. It seems that they were constantly on call to fix this or that, as the occasion arose. In fulfilling these needs of plaintiff, defendants provided the services, and did the work as shown on the statements which make up the exhibit. I view this as extra work apart from the job of renovation.

found to be due to Kentx, I arrive at the net amount due that plaintiff of $19,551 for which judgment will be rendered.

All things considered, the Court is of the opinion that the value given to defendants' work does them no injustice. The Court bears in mind that in June of 1975 Brunt had estimated the work at about $122,081. At the same time he had estimated the work in his application for a building permit at $150,000. Granted the latter is not to be considered a hard and fast estimate and that perhaps, as Brunt testified, contractors customarily offer an estimate in applying for a building permit something on the low side, and further considering the fact that his $122,081 estimate was before certain changes had been ordered, these figures still have relevance. Moreover, and more importantly, in October of 1975, at a time when the earlier estimate was to be revised upwards and when it was important that plaintiff be advised with accuracy what the total cost of completion would be, defendants, at this time when most, if not all, changes had been either made or agreed to, gave an estimate of $143,000.

In view of the nature of these proceedings, taking into account that the strong likelihood is that each party will walk away from these proceedings with some degree of unfulfilled expectancy, it would appear just that neither side be awarded any costs whatsoever. It will be so ordered.